THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

L.R. COSTANZO CO. INC.                    :
                                          :
                    Plaintiff             :
                                          :
        v.                                :    3:10-CV-774
                                          :    (JUDGE MARIANI)
AM. FIRE & CAS. INS. CO., et al.,         :
                                          :
                                          :
                    Defendants            :

## MEMORANDUM

Presently before the Court are Defendants' Motions for Summary Judgment (Docs. 20, 21). The Court concludes that The Ohio Casualty Insurance Company (OCIC) did not issue the policy in question to Plaintiff and is therefore not a proper party to this suit. Furthermore, even assuming an insurance contract existed between OCIC and Plaintiff, the Court finds there was no "occurrence" under the policy that triggered any duty to defend Plaintiff. As such, there was no bad faith on Defendants' part.

### Factual Background and Procedural History

Because Plaintiff admitted to most of Defendants' Statements of Material Fact (SOMF) and submitted scant supporting evidence in opposition to Defendants' motions, the Court relies on many of Defendants' factual assertions and supporting documentation.

Plaintiff was the general contractor for the Pocono Mountain Regional Police Commission (PMRPC) who sued Plaintiff in the Monroe County Court of Common Pleas for

1

property damage upon conclusion of the project (*Pocono Mountain Reg'l Police Comm'n v. L.R. Costanzo Co. Inc.*, 8961-CV-09) (hereinafter "Underlying Complaint"). As a result, Plaintiff sued Defendants in the Lackawanna County Court of Common Pleas for a defense against the underlying action under the commercial general liability (CGL) policy it allegedly carried with Defendants. Under the policy, the duty to defend would be triggered by an "occurrence," which means "an accident, including continuous exposure to substantially the same general harmful conditions." (Doc. 21, Ex. D, E). "Accident" is not defined in the policy. Defendants removed the case to federal court (Doc. 1).

Defendant OCIC moved to dismiss (Doc. 8) alleging that it did not issue the insurance policy in question so there was no contract between itself and Plaintiff, but the Court denied it (Doc. 13). All discovery was completed, and Defendants timely filed motions for summary judgment (Doc. 20, 21). Plaintiff bases its action on a breach of contract theory and a bad faith theory under 42 PA. C.S.A. § 8371. (Doc. 1, Ex. A). The Court has jurisdiction under 28 U.S.C. § 1332(a), and the substantive law of Pennsylvania applies.

## Standard of Review

### A. Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*,

901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, ... [o]nly disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party

moving for summary judgment bears the burden of showing the absence of a genuine issue as

to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing

has been made, the non-moving party must offer specific facts contradicting those averred by

the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S.

871, 888 (1990). "Inferences should be drawn in the light most favorable to the non-moving

party, and where the non-moving party's evidence contradicts the movant's, then the non-

movant's must be taken as true." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358,

1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## Discussion

There are three issues before the Court: 1) whether OCIC is a proper defendant, 2)

whether Defendants breached a duty to defend Plaintiff in the underlying case, and 3) if so,

whether Defendants acted in bad faith in not defending Plaintiff.

### A. OCIC is not a proper defendant to this suit

Initially, Plaintiff alleged sufficient facts to survive Defendant's motion to dismiss, but

upon deposition testimony and further production of evidence, it is clear that American Fire

(AFCC) issued the policy, not OCIC. AFCC has admitted that it underwrote the policy (Doc. 5,

¶3), and Plaintiff's own insurance agent, Rosemary Steer, testified at her deposition that AFCC

underwrote the CGL policy while OCIC underwrote the umbrella policy (Doc. 22, Ex. AA, *see*

*also* Doc. 21, Ex. J, Part 4, LRC191-92). Much of the confusion over whether OCIC is a proper defendant stems from the similarity of its name to Ohio Casualty *Group* (OCG). OCG is the parent company of AFCC, OCIC, and ten other insurance companies, and it is the trademark umbrella under which these subsidiary companies operate. (Doc. 21, Ex. J, Part 4, LRC205-207; Doc. 7, Disclosure Statement pursuant to FRCP 7.1; Payes deposition at 50-51 (Doc. 21, Ex. K)). In turn, OCG is a subsidiary of Liberty Mutual Group. (Doc. 7; Radle deposition at 43, 62 (Doc. 21, Ex. L)). Plaintiff either admits to these factual assertions or fails to provide any contrary evidence. (Doc. 26).

OCG's letterhead and formal correspondence say "Ohio Casualty," "Ohio Casualty Group," or "Ohio Casualty™." To eliminate the confusion, Defendant has provided uncontradicted evidence that "Ohio Casualty" refers to *OCG*, and every document related to the CGL policy at issue, while bearing the OCG logo, also said, "Underwriter: American Fire & Casualty Company," "Coverage is Provided In: American Fire & Casualty Company," or other language that identified AFCC as the insurer (*see e.g.*, Doc. 21, Ex. F, LRC389, Doc. 21, Ex. D, LRC960-72; Doc. 21, Ex. E, LRC1181-1203, Doc. 1, Ex. A). The Certificates of Liability Insurance listed AFCC as "Insurer A" and noted that "Insurer A" issued the CGL policy. (Doc. 21, Ex. J, Part 4, LRC190-91). At their depositions, Plaintiff's employees who are responsible for procuring insurance contracts and maintaining insurance records did not dispute that AFCC was listed as the underwriter on the CGL policy documents. (Doc. 21, Ex. M, Costanzo

Deposition; Doc. 21, Ex. P, Dushney Deposition).[1]  Plaintiff does not provide any evidence to dispute these assertions, either.  (Doc. 26).

Plaintiff points to the billing website and e-mail addresses which include variants of the terms, "ohiocasualty-insurance.com", but they most likely refer to OCG.  Neither side has presented evidence as to whether the websites and e-mail addresses refer to OCG or OCIC.  However, Michael Radle testified at his deposition that he works for Liberty Mutual and OCG, so by logical inference, his e-mail address (michael.radle@ohiocasualty-insurance.com) refers to OCG (Doc. 21, Ex. L, at 4).  Finally, billing invoices from OCG directed Plaintiff to make checks payable to OCIC.  (Doc. 11, Ex. A).  OCIC argues this was because Plaintiff carried multiple policies with OCIC, in addition to the CGL policy with AFCC.[2]  (Doc. 28).  In any case, just because Plaintiff sent payments to OCIC, it does not necessarily follow that OCIC issued the CGL policy because the payments were for multiple policies in addition to the CGL policy.

The only piece of evidence that suggests OCIC is the underwriter is the initial denial of coverage letter from claims handler Barbara Payes that stated, "We have investigated this claim and have determined that the allegations fall outside of the coverage provided by your liability policy carried with Ohio Casualty Insurance Company."  (Doc. 21, Ex. J, Part 4,

---

[1] Mr. Costanzo said he thought OCIC was the insurer, but he stated Plaintiff's insurance agent, Ferrario Agency, made that representation to him. (Doc. 21, Ex. M, at 27-8). Ms. Dushney thought OCG was Plaintiff's insurer. (Doc. 21, Ex. P, at 20). However, Plaintiff's pleadings and briefs do not allege any fraud or misrepresentation on the part of OCG, OCIC, or AFCC.

[2] "Ohio Casualty" issued an Inland Marine policy (BMO 53515050) and a Commercial Umbrella policy (USO 53515050) not at issue in this case. (Doc. 21, Ex. J, Part 4, LRC190-91). The CGL policy number (BKA 53515050), which appeared on the policy identifying AFCC as the underwriter (Doc. 1, Ex. A), differs from the numbers for these other policies. The Court further notes the CGL policy number is sometimes listed as BKW 5315050 (Doc. 21, Ex. J, Part 4, LRC190-91 and Doc. 21, Ex. N), but AFCC is still identified as the underwriter on these documents, as well.

LRC205).[3] However, in the face of all the aggregate uncontradicted evidence that AFCC underwrote the policy, this one instance in which OCIC was referred to in writing as the underwriter is insufficient to survive a summary judgment motion.[4]

*B. There was no "occurrence" under the policy that triggered Defendants' duty to defend*

Even were the Court to assume that OCIC did issue the CGL policy, Defendants owed no duty to defend Plaintiff in the underlying action. To determine whether an insurer has a duty to defend the insured, a reviewing court must look *only* at the underlying complaint.[5] In *Kvaerner*, the court said, "[i]t is well established that an insurer's duties under an insurance policy are triggered by the language of the complaint against the insured." 908 A.2d at 896. Citing an earlier Pennsylvania Supreme Court case,[6] it said, the "rule everywhere is that the obligation of a casualty insurance company to defend an action brought against the insured is to be determined solely by the allegations of the complaint in the action." *Id.* Therefore, the Superior Court erred in "looking beyond the allegations raised in [the third party's] Complaint to determine whether [Defendant] had a duty to defend Kvaerner." *Id.* In light of Pennsylvania precedent, this Court is precluded from considering the opinions of engineers and consultants that the alleged property damage was caused by the poor design of the architect and not by

---

[3] The second denial of coverage letter, issued after receipt of the Underlying Complaint, identified AFCC as the underwriter (Doc. 21, Ex. J, Part 4, LRC199).

[4] Because Plaintiff sued Defendants on a breach of contract theory, there is no liability of OCG under a tort theory of vicarious liability. Neither has Plaintiff asserted it had a contract with OCIC's parent, OCG, so there is no privity of contract between Plaintiff and OCG.

[5] *Kvaerner Metals Div. v. Commercial Union Ins. Co.*, 908 A.2d 888 (Pa. 2006) (reversing Superior Court's decision to look at an expert report outside the third party complaint to determine whether a duty to defend existed).

[6] *Wilson v. Md. Cas. Co.*, 105 A.2d 304, 307 (Pa. 1954).

any faulty workmanship by Plaintiff.  Plaintiff referred to these opinions in its Reply Brief (Doc. 24), but the Court must look at the Underlying Complaint only.[7]

In this case, the Underlying Complaint in set forth four counts: 1) breach of contract, 2) breach of warranty, 3) breach of good faith, and 4) negligence by Costanzo in the building project (Doc. 1, Ex. B).  In its complaint, the PMRPC alleged several problems after completion of the project.[8]  As a result of these alleged problems, the roof suffered from several leaky areas, and "inadequate ventilation subject[ed] the roof structure to moisture, excessive heat, expansion and contraction thus reducing its useful life expectancy." *Id.* at ¶ 10.  Relevant excerpts from the Underlying Complaint state, "Defendant's planning, fabrication, construction and installation of the PMRPD asphalt shingle roof system was performed in an improper, unworkmanlike and unacceptable manner," (Doc. 1, Ex. B, ¶ 33), and Costanzo breached its covenant of good faith and fair dealing when it "failed to ensure that the PMRPC construction project was performed in a workmanlike manner, free from structural and/or construction

---

[7] Plaintiff's Reply Brief does not cite to any evidence in the record, and the above factual allegations are not contained in the Plaintiff's SOMF.  Plaintiff did submit an "expert" report by outside counsel (Michael Mey) opining that Defendant's decision not to defend was made in bad faith. (Doc. 24, Ex. A).  In his report, Mey refers to these consultants' and engineers' opinions but does not attach them.  Even were the opinions before the Court, it could not consider them because they are beyond the four corners of the Underlying Complaint.

[8] In pertinent part:

> ice damming was occurring on the roof shingles creating water build up ultimately leaking through the plywood deck into the building; the fiber glass insulation in the building was improperly installed; duct work is internally lined but lacks external insulation; the r-value of the internal liner at one inch thick is approximately R=3 which is minimal; the flex ducts that supply the air to the individual diffusors penetrate the building fiber glass insulation and do not provide good seal allowing air to leak from the warm building area up to the attic; air barrier for the ceiling insulation is lacking; the fiber glass insulation is stapled to the undersigned of the wood tress and lacks a drywall air barrier installed on the underside of the wood tress, the vapor barrier is "inset" stapled the craft paper vapor barrier joints are not overlapped and taped allowing air to pass easily from the occupied space through the insulation into the attic; fiber glass insulation does not stop the flow of air when there is a difference in pressure and when the vapor barrier is not overlapped and taped with the joints in the vapor barrier also not taped.

(Doc. 1, Ex. B, ¶ 10).

defects, deficiencies, and inadequacies," (Doc. 1, Ex. B, ¶ 39). Thus, on its face, the Complaint

alleges faulty workmanship as the basis for its counts/claims.

Defendants' duty to defend turns on whether the faulty workmanship alleged in the

Underlying Complaint qualified as an "occurrence," which means "an accident, including

continuous exposure to substantially the same general harmful conditions" under the CGL

policy.[9] (Doc. 21, Ex. D, E). Faulty workmanship, however, is not an "occurrence" under

Pennsylvania law. *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223 (3d Cir.

2010); *Kvaerner Metals Div. v. Commercial Union Ins. Co.*, 908 A.2d 888 (Pa. 2006); *Millers*

*Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706 (Pa. Super. Ct. 2007). There is

substantial case law in Pennsylvania and the Third Circuit stating that breach of contract,

breach of warranty, and even negligence claims do not give rise to an "occurrence" when it

means "accident" as it does here. In *Kvaerner*, the trial court had concluded that the third party

plaintiff was "solely seeking damages for Kvaerner's breach of the contract, rather than

damages caused by an accident." 908 A.2d at 894. Because the policy did not define

"accident," the court defined it as "something that occurs unexpectedly or unintentionally,"

which "implies a degree of fortuity that is not present in a claim for faulty workmanship." *Id.* at

897-8. The Pennsylvania Supreme Court agreed and cited other Pennsylvania cases in which

"the court held there was no coverage under the CGL policy because the complaint set forth

solely claims for breach of contract." *Id.* at 898. The court further ruled that to find a duty to

---

[9] Defendants gave five reasons for not defending Plaintiff: 1) there was no "occurrence" under the policy, 2) Plaintiff knew of the damages in the Underlying Complaint before the policy came into effect, 3) the "contractual liability" exclusion applied, 4) the "work product" exclusion applied, and 5) Plaintiff did not notify Defendants as soon as practicable. (Doc. 21, Ex. J, Part 4, LRC203). Of these reasons, Defendants' motions for summary judgment rest solely on the no "occurrence" issue.

defend in breach of contract or negligence causes would "convert CGL policies into performance bonds, which guarantee the work, rather than like an insurance policy, which is intended to insure against accidents." *Id.* at 899. Third Circuit interpretations of Pennsylvania law have concluded that a "breach of contract claim could not constitute an occurrence in a CGL policy." *Specialty Surfaces Int'l v. Cont'l Cas. Co.*, 609 F.3d 223, 238 (3d Cir. 2010) (citing *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 594, 598 (3d Cir. 2009) ("We are, therefore, confident that the Supreme Court of Pennsylvania would conclude that an underlying claim alleging breach of contract would not trigger coverage under a [CGL] policy.")).[10]

Even if Plaintiff's work itself were not faulty and a subcontractor's work were faulty, there is no duty to defend. In *Gambone*, the third party plaintiffs had sued a general contractor for damage to their homes which resulted from defective stucco exteriors installed by subcontractors that caused water damage to the interior of their homes. Their complaints alleged the leaks were the result of "construction defects and product failures" and the counts were breach of contract, breach of warranty, and negligence, among others. 941 A.2d at 709. The general contractor conceded that the defective stucco *exteriors* did not constitute an "occurrence" under the policy, but claimed the resulting water damage to the "non-defective work" done on the *interior* homes was "ancillary and accidental" and therefore an "occurrence." *Id.* at 713. The court adhered to *Kvaerner* and found the defendant-insurers had no duty to defend. If the claimed damage was a "natural and foreseeable" result of "faulty workmanship," such a claim would not constitute an "occurrence," even if the work-product led to damage to

---

[10] The court in *Specialty Surfaces* also concluded that the negligence claim did not allege anything arising to an "occurrence" under the policy, so the defendant was not obligated to defend there, either.

property other than to the completed work product itself and the insured's subcontractor performed the faulty work. *Id.*

Because the Underlying Complaint squarely alleges faulty workmanship (rather than an "accident") as the basis of its claims against Plaintiff, Defendants had no duty to defend Plaintiff in the underlying case. Plaintiff argues that its work was not faulty but was in accordance with the architect's faulty design. That argument is appropriate for the underlying case but not here. Even were the Court to conclude that the Underlying Complaint alleges defective design by the architect, there is still no "occurrence" because Plaintiff's argument is analogous to asserting faulty workmanship by a subcontractor, which is controlled by *Gambone*. Furthermore, a sister court has held that "negligent or defective design, in a case in which the product is designed pursuant to and in accordance with a contract, is necessarily part and parcel of the contract performance" under Pennsylvania law. *Nat'l Fire Ins. Co. v. Robinson Fans Holdings, Inc.*, No. 10-1054, 2011 U.S. Dist. LEXIS 37941 (W.D. Pa. Apr. 7, 2011).

Plaintiff cites one case[11] in support of its contention that there was an "occurrence," but that case is inapplicable because it involved an all-risk policy, which the court expressly stated was distinct from an occurrence policy. Therefore, because faulty workmanship cannot constitute an "occurrence," Defendants are awarded summary judgment on this issue.[12]

---

[11] *PECO Energy Co. v. Boden*, 64 F.3d 852 (3d Cir. 1995) (holding that several thefts of oil over several years constituted a single occurrence such that the insured would not have to pay a separate deductible for each theft before triggering coverage).

[12] In reaching this decision, the Court notes that the initial reason Defendant gave for not defending Plaintiff (on September 23, 2009) was the "work product" exclusion of the policy. (Doc. 21, Ex. J, Part 4, LRC207). The record is unclear when the Underlying Complaint was filed against Plaintiff. Plaintiff's Complaint says it was "on or about September 20, 2009." (Doc. 1, Ex. A, ¶8). Plaintiff's expert said it was September 29, 2009. (Doc. 24, Ex. A, at 7). According to Defendant's log notes, AFCC's claims handler did not receive notice of the Underlying Complaint before she issued the first denial letter, because the Underlying Complaint was filed on September 20th, withdrawn

### C. In light of the foregoing, Defendants did not act in bad faith

Under Pennsylvania law, to recover for bad faith, the insured must show that the insurer "did not have a reasonable basis for denying" the requested relief, and "knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994). Bad faith can include "lack of good faith investigation into facts, and failure to communicate with the claimant." *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. Super. Ct. 2004). The insurer's conduct need not be fraudulent, but "mere negligence or bad judgment is no bad faith." *Id.* Finally, the insured has the "burden of proving bad faith by clear and convincing evidence." *Nw. Mut. Life Ins. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005). Because there was no "occurrence" under the policy, Defendants did not act in bad faith in denying a defense to Plaintiff in the underlying case. Further, the record shows that Defendants engaged in a thorough inquiry before determining there was no duty to defend.

Plaintiff's primary argument for bad faith was that Defendants conducted an inadequate investigation before declining to defend Plaintiff in the underlying suit. To support this allegation, Plaintiff retained the services of an expert, Michael Mey, who concluded that Defendants did not perform an adequate investigation, partly based on the allegedly

---

by PMRPC, and re-filed on September 28th. (Doc. 27, Ex. W, LRC968, 970). The first acknowledgement that Defendants gave to Plaintiff of the Underlying Complaint was the December 22, 2009 denial letter from Michael Radle. (Doc. 21, Ex. J, Part 4, LRC199-204). This time, though, one of the reasons cited for denial was the lack of an "occurrence." Plaintiff has neither raised the argument that Defendants received the Underlying Complaint before issuing the first denial, nor has the Court concluded that this issue raises sufficient doubt to preclude summary judgment in favor of Defendants.

inadequate training and experience of the two claims representatives who reviewed Plaintiff's request for coverage.  (Doc. 24, Ex. A, at 10-13).

Defendants, however, provided log notes that documented the claims review process. (Doc. 27, Ex. W).  The log notes show that beyond the two claims representatives (Payes and Radle), "managers, liability unit leaders and supervisors" reviewed the case.   (Doc. 27).  After Radle received a copy of the Underlying Complaint and reviewed the claim, he felt there was no coverage because there was no "occurrence."  However, before he issued the disclaimer, he requested a roundtable review of the claim with a senior analyst, liability unit leader, and claims manager. (Doc. 27, Ex. W, LRC967).  After the four discussed the claim, they obtained coverage opinion from outside counsel.  (Doc. 27, Ex. W, LRC962).  Only afterwards did Radle issue the disclaimer letter.  (Doc. 21, Ex. J, Part 4, LRC199-204).  Plaintiff alleges, "[t]he insurer failed to obtain a legal opinion from counsel and did not retain the services of a building expert." (Doc. 24, at 9).  However, as stated before, Defendant submitted evidence that it did consult outside legal counsel.  (Doc. 27, Ex. W. LRC962).  Furthermore, because it determined there was no "occurrence" under the policy, there would be no need to retain the services of a building expert.  Based on this evidence, the Court concludes Defendants had a reasonable basis for declining to defend Plaintiff in the underlying case.  Therefore, Plaintiff has failed to meet its burden of showing clear and convincing evidence of bad faith.

## Conclusion

The Court grants Defendant OCIC's Motion for Summary Judgment that it is not a proper defendant to this suit.  The Court also grants Defendants' separate Motions for

Summary Judgment that there was no "occurrence" under the CGL policy triggering any duty to

defend Plaintiff.  Because there was no "occurrence" under the policy, and Plaintiff's claim for

coverage was thoroughly reviewed, the Court grants Defendants' Motions for Summary

Judgment on the bad faith claim, as well.  An appropriate order follows.

Robert D. Mariani
United States District Judge

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

L.R. COSTANZO CO. INC.          :

              **Plaintiff**    :

   v.                  :     3:10-CV-774

                         :     (JUDGE MARIANI)

AM. FIRE & CAS. INS. CO., et al.,   :

                         :

          **Defendants**   :

## ORDER

**AND NOW, THIS 6th DAY OF JANUARY, 2012, IT IS HEREBY ORDERED THAT:**

1. Defendant OCIC's Motion for Summary Judgment (Doc. 21) on its claim that there was no contract between itself and Plaintiff is **GRANTED.**

2. Defendants' separate Motions for Summary Judgment (Docs. 20, 21), on the basis that there was no "occurrence" under the Commercial General Liability policy that would trigger a duty to defend Plaintiff, are **GRANTED.**

3. Because there was no "occurrence" under the policy, and Plaintiff's claim for coverage was thoroughly reviewed, Defendants' Motions for Summary Judgment (Docs. 20, 21) on the bad faith claim are **GRANTED.**

4. **JUDGMENT IS ENTERED IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFF.**

5. The Clerk is hereby directed to **CLOSE** the case.

_____
Robert D. Mariani
United States District Judge